## THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| DISH NETWORK L.L.C., | § | |
| | § | CIVIL ACTION NO. 4:21-CV-00581 |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| BASSAM ELAHMAD, a/k/a Bassem El | § | |
| Ahmad and d/b/a Elahmad.com | § | |
| | § | |
| Defendant. | § | |

### PLAINTIFF DISH NETWORK L.L.C.'S AMENDED MOTION
### FOR ENTRY OF DEFAULT AND DEFAULT JUDGMENT

Plaintiff DISH Network L.L.C. ("DISH") files this amended motion to enter default and grant default judgment against Defendant Bassam Elahmad, a/k/a Bassem El Ahmad ("Defendant"). DISH also addresses the Court's concerns about personal jurisdiction. (Dkt. 24).

### Entry of Default

Defendant is a resident of Germany. (DISH's First Amended Complaint, Dkt. 11, ("FAC") 11 ¶ 4.) Federal Rule of Civil Procedure 4(f)(1) permits service on a foreign individual under the Convention on Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters ("Hague Service Convention"). Germany has signed the Hague Service Convention. *See generally Status Table*, Hague Conference on Private Int'l Law (May 19, 2020), https://www.hcch.net/en/instruments/conventions/status-table/?cid=17 (listing member States). DISH, therefore, served Defendant in accordance with the Hague Service Convention.

The Central Authority of Germany confirmed that Defendant was served in October 2021 under the Hague Service Convention with the summons, FAC, Order for Conference (Dkts. 4, 16), and Judge Bennett's Procedures. (Dkt. 20.) Thus, service was proper under Fed. R. Civ. P. 4(f)(1).

Defendant was required to file a responsive pleading within 21 days of being served. *See*

Fed. R. Civ. P. 12(a)(1)(A)(i). Defendant has not filed an answer or other responsive pleading or requested more time to do so. (Dkt. 22-5 ¶ 3.) Defendant is not a minor, incompetent, or exempt under the Servicemembers' Civil Relief Act. (*See id.* ¶¶ 4-10; Dkt. 22-6 Exs. 1-4); FAC ¶¶ 1-2, 4, 14-34 (resident of Germany and copyright infringement).) Default should be entered.

<u>**Default Judgment**</u>

### I.    Summary

DISH brought this contributory copyright infringement action to stop Defendant from providing access to 16 television channels exclusively licensed to DISH in the United States ("Protected Channels"). Defendant provides hundreds of thousands of individuals in the United States with free access to the Protected Channels and the programs that air on these channels through Defendant's Elahmad.com domain and website ("Elahmad Website"). The Elahmad Website has links for the Protected Channels. When users of the Elahmad Website click on these links, they receive streams of the Protected Channels and the programs that air on the channels. Defendant infringed DISH's exclusive rights to publicly perform the programming that airs on the Protected Channels by inducing and materially contributing to copyright infringement. Defendant is liable for contributory copyright infringement.

Defendant willfully engaged in these illegal activities for eight and a half years, and continues to do so, despite this action and being served with the complaint and motion for default judgment and despite receiving at least 62 notices of infringement informing him of the infringing nature of his conduct and demanding that he remove the Protected Channels.

The Elahmad Website is targeted to users in the United States. The largest number of the users of the Elahmad Website are in the United States. Defendant provides free access to the Protected Channels so that he receives significant revenue from advertising from United States

businesses targeting Elahmad Website users in the United States. Nearly all of the technologies used to operate and promote the Elahmad Website are provided by United States entities that Defendant contracts with, including CloudFlare, Inc., which has data centers in 39 major United States cities that were used by Defendant to provide access to the Protected Channels to Elahmad Website users throughout the United States.

The Court has specific personal jurisdiction over Defendant under Rule 4(k)(2) based on Defendant's contacts with the United States in providing the Protected Channels. Default judgment is appropriate. DISH requests statutory damages of $3,450,000 for 23 registered, copyrighted works–a small fraction of Defendant's overall infringement–and a permanent injunction to prevent further infringement, including an order for third-party service providers to stop providing services supporting Defendant's infringement and an order for registries and registrars to disable and transfer to DISH the domains supporting Defendant's infringement.

## II.     Argument and Authorities

### A.     Legal Standard

Default judgment is properly entered if the well-pleaded factual allegations in the complaint, taken as true, establish Defendant's liability. *See Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975). Damages may be awarded without a hearing if "the amount claimed is a liquidated sum or one capable of mathematical calculation." *James v. Frame*, 6 F.3d 307, 310 (5th Cir. 1993).

### B.     The Court has Jurisdiction to Grant Default Judgment.

Defendant defaulted by failing to respond to or defend this action despite being properly served. (Dkt. 20.) DISH also served Defendant with a copy of DISH's first motion for default judgment and this Motion under Local Rule 5.5. (Dkt. 22-8; Certificate of Service.)

3

### 1.  The Court has Subject Matter Jurisdiction and Venue is Proper.

This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338 because DISH asserts claims under the Copyright Act, 17 U.S.C. § 101 *et seq*. (FAC ¶ 5.) Venue is proper in this Court because Defendant is a nonresident that may be sued in any judicial district, this case involves violations of the Copyright Act, and Defendant is subject to personal jurisdiction. 28 U.S.C. §§ 1391(b)(3), (c)(3), 1400(a); (FAC ¶ 8.)

### 2.  The Court has Personal Jurisdiction Over Defendant Under Rule 4(k)(2).

Defendant operates the Elahmad Website, which provides users in the United States with the Protected Channels. (FAC ¶¶ 7, 11-14, 17-22.) Defendant's conduct harms DISH, a United States-based company, by infringing on its United States-based exclusive rights through unauthorized public performances in the United States. (FAC ¶¶ 3, 10-12, 14, 17.) Defendant profited from his infringement through advertising by United States-based entities that targeted United States users. (FAC ¶¶ 20-21.) Defendant streamed the Protected Channels to United States users through computer servers in the United States that Defendant used by contracting with a United States-based company. (Ferguson Decl. ¶¶ 10–13, Exs. 13–15.) DISH's FAC alleges personal jurisdiction is proper under Rule 4(k)(2). (FAC ¶ 7.)

A district court has personal jurisdiction over a foreign defendant for a claim that arises under federal law, such as the Copyright Act, if the defendant is not subject to jurisdiction in any individual state's court and the exercise of jurisdiction satisfies constitutional due process. Fed. R. Civ. P. 4(k)(2). "[S]o long as a defendant does not concede to jurisdiction in another state, the court may use 4(k)(2) to confer jurisdiction." *Adams v. Unione Mediterranea Di Sicurta*, 364 F.3d 646, 651 (5th Cir. 2004). The district court performs the same "minimum contacts" due process analysis under Rule 4(k)(2) as under Rule 4(k)(1); the only difference is the defendant's contacts

4

with the United States are examined "as a whole," as opposed to a single state. *Id*. at 650-51. The contacts must bear some relation to the case. *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1029 (2021). "Rule 4(k)(2) cases involving specific personal jurisdiction have arisen and continue to arise with regularity." *Douglass v. Nippon Yusen Kabushiki Kaisha*, ---F.4th---, 2022 WL 3368289, at *8, 10, n.1 (5th Cir. Aug. 16, 2022) (approvingly citing *Adams* and *Nagravision* for the proposition that a foreign corporation's contacts satisfy due process under Rule 4(k)(2) where the parties' dispute arose out of or related to those United States contacts). When considering Defendant's contacts with the United States in connection with the Elahmad Website and the copyright infringement at issue, Rule 4(k)(2) provides personal jurisdiction.

### i.     The Elahmad Website is Interactive.

To establish jurisdiction, a website must permit at least some "exchange" of "information" between the user and the website. *Mink v. AAAA Dev. LLC*, 190 F.3d 333, 336 (5th Cir. 1999). Jurisdiction is most appropriate for websites that involve either "entering into contracts" in the forum or "the knowing and repeated transmission of computer files [over] the internet." *Id.* The Elahmad Website is the type of website for which personal jurisdiction is most appropriate because it is an internet TV streaming service that transmits computer files of TV content to users who select from the website's electronic channel guide. (FAC ¶¶ 14-18.)

A website with a high "level of interactivity and commercial nature of the exchange of information" will also support jurisdiction. *Mink*, 199 F.3d at 336. Defendant's Elahmad Website earns an estimated $890 per day, $26,700 per month, and $320,400 per year from targeted advertising on the home page, the Live Broadcast page including the electronic channel guide, and the pages providing access to the Protected Channels. (Ferguson Decl. ¶¶ 3–5, 8, Exs. 2, 4, 6, 10.) The Elahmad Website is valued at over $1.35 million based on this targeted advertising and its

high level of traffic is currently estimated at 59,383 visits per day, 1,781,490 visits per month, and 21,377,880 visits per year. (*Id.* ¶ 8, Ex. 10; FAC ¶ 21.) Since November 2020, the Elahmad Website has averaged over 2 million visits per month with about 588,756 visits per month – about 30% – coming from users in the United States. (Ferguson Decl. ¶ 2, Ex. 1; FAC ¶ 7.) Users in the United States visit the Elahmad Website in numbers three to five times greater than the country with the next most traffic, accounting for an oversized portion of Defendant's revenue. (*Id.*)

The Elahmad Website therefore fits within the category of websites for which personal jurisdiction is presumptively appropriate. *Mink*, 199 F.3d at 336; *see Exxon Mobil Corp. v. Exxonmobil for Exp., Imp. & Trade Ltd.*, No. 3:12-CV-01122-P, 2013 WL 12124587, at *7 (N.D. Tex. Jan. 25, 2013) (finding 4(k)(2) jurisdiction over website that, although on the passive end of the scale, described defendant as a "commercial supplier" of oil-related products to the world market including the United States); *UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344, 349 (4th Cir. 2020) (finding jurisdiction over free website that provided a music ripping service, and which was monetized through advertising, with 10% of its traffic from the United States). The Elahmad Website involves a significant exchange of information with users who receive streams of content from the large selection offered by Defendant. The Elahmad Website also offers a high level of interactivity of a commercial nature, as shown by the value of the website, its targeted advertising, and the number of users. Indeed, the Elahmad Website is monetized through advertising with approximately three times as much traffic from the United States as the websites in *Kurbanov*.

### ii. Defendant Contracted with Service Providers in the United States to Promote and Operate the Elahmad Website.

Defendant contracted with California-based CloudFlare, Inc. to conceal his webhost's IP address and to optimize the performance and load times of the Elahmad Website channel streams for users in the United States. (Ferguson Decl. ¶¶ 9–13, Exs. 11–15; Dkt. 22-1 ¶ 9; Dkt. 22-2, Ex.

4.) CloudFlare's service assists websites like Defendant's to distribute audiovisual content across great distances or to many users. CloudFlare's content optimization service "cache[s] static assets across [the CloudFlare] network and always directs end users to the closest data center, minimizing latency." (Ferguson Decl. ¶ 10, Ex. 13 at 4.) CloudFlare has data centers in 39 large United States cities, which were used by Defendant to minimize load times and latency to better stream content to users in the United States. (*Id.* ¶¶ 10–11, Exs. 13-14.)

Personal jurisdiction is appropriate under Rule 4(k)(2) because Defendant purposefully directed his contacts to the United States by deliberately contracting with CloudFlare to route content from the Elahmad Website through computer servers in the United States, decreasing load times and latency for Untied States users. *See Nagravision SA v. Gotech Int'l Tech. Ltd.*, 882 F.3d 494, 498–99 (5th Cir. 2018) (approving personal jurisdiction over foreign defendants under Rule 4(k)(2) where plaintiffs alleged that defendants "use a network of servers located in various cities across . . . the United States to engage in the unauthorized distribution of Nagravision's control words in violation of [federal law]"); *42 Ventures, LLC v. Mav*, No. 20-17305, 2021 WL 5985018, at *1 (9th Cir. Dec. 16, 2021) ("[D]eliberately choosing servers in the United States to enable faster service to United States-based customers could indicate purposeful direction to the United States").

Defendant contracts with Arizona-based Namecheap Inc., for the Elahmad Website domain name, which uses the Virginia-based domain registry Verisign, Inc. (Ferguson Decl. ¶ 14, Ex. 16; Dkt. 22-1 ¶ 9, Ex. 4; Dkt. 22-5 ¶ 24.) Defendant purchased Namecheap's Whoisguard service to conceal his true contact information making it harder for DISH to identify him for this case. (Ferguson Decl. ¶ 14, Ex. 16 at 4.) During 2017 and 2018, Defendant contracted with Massachusetts-based The Endurance International Group, Inc. d/b/a FastDomain, Inc. for the Elahmad Website domain name. (*Id.* ¶ 15, Ex. 17; Dkt. 22-1 ¶ 10; Dkt. 22-2, Ex. 5.) Domain names

are available from registrars throughout the world, but Defendant chose to obtain the Elahmad Website domain name from United States-based entities instead.

Defendant contracts with California-based social media companies Facebook, Inc.; Twitter, Inc.; Pinterest, Inc.; and Google LLC (YouTube) to promote the Elahmad Website in the United States. (Ferguson Decl. ¶¶ 17-20, Exs. 19–25; Dkt. 22-1 ¶ 11; FAC ¶ 19.) Defendant contracts with California-based technology companies Google LLC (Gmail, Googlemail, Google Plus) and Microsoft Corporation to send and receive communications about the Elahmad Website, including communications related to United States law such as Digital Millennium Copyright Act ("DMCA") notices from copyright holders such as DISH. (Ferguson Decl. ¶¶ 6-7, 14, 16-17, 19-20, Exs. 8-9, 16, 18, 20, 24-25; Dkt. 22-1 ¶¶ 13-14; FAC ¶ 15.) Defendant also contracts with Washington-based file sharing and software development company GitHub, Inc. to host code that runs the Elahmad Website. (Ferguson Decl. ¶ 16, Ex. 18; Dkt. 22-1 ¶ 12.)

In total, Defendant uses 65 technologies to operate and monetize the Elahmad Website. (Ferguson Decl. ¶ 9, Ex. 11.) These technologies include 44 provided by 26 entities in the United States and only 2 provided by entities abroad.[1] (*Id.* ¶ 9, Exs. 11-12.) "In context of a lawsuit involving an international entity and implicating the federal sovereign, these contacts come together to reveal a foreign entity purposely targeting markets in the United States." *Exxon*, 2013 WL 12124587, at *6 (finding jurisdiction over website using California-based Yahoo! Inc. for email, Facebook to promote it, and a Washington-based domain registrar). The Elahmad Website also uses a US-based domain registrar, a US-based email provider, and Facebook to promote it as did the website at issue in *Exxon*. But as discussed above, the Elahmad Website uses considerably more US-based providers and technologies than that website in *Exxon*.

---

[1] 19 of the technologies are open-source or standards not provided by entities. (*Id.* ¶ 9, Ex. 11.)

### iii.   Defendant Provides Targeted Advertisements to Users of the Elahmad Website in the United States.

Defendant provides free access to the Elahmad Website and the Protected Channels to attract more users and profit by serving them with banner advertisements targeted to the user's location. (Ferguson Decl. ¶¶ 3–5, 8, Exs. 2–7, 10; FAC ¶ 20.) Defendant collects the geographic locations of users by identifying their IP addresses. (Ferguson Decl. ¶ 3, Ex. 2.) The Elahmad Website then provides location-targeted banner advertisements to the users by United States-based advertising partners that Defendant contracts with. (Dkt. 22-1 ¶ 11; Ferguson Decl. ¶¶ 3-5, 9, Exs. 2–7, 11.) By doing so, Defendant purposefully availed himself of the privilege of conducting business within the United States. *See Kurbanov*, 963 F.3d 344 at 353 (finding personal jurisdiction over free website that collected user IP addresses and profited by selling targeted advertisements).

United States-based users represent about 30% of the monthly visitors to the Elahmad Website. (Ferguson Decl. ¶ 2, Ex. 1; FAC ¶ 7.) This represents about 588,756 visits per month coming from users in the United States, which is three to five times greater than the country with the next most traffic. (*Id.*) Because the Elahmad Website "engag[ed] in sizeable and continuing commerce with United States customers[,]" Defendant "should not be surprised at United States-based litigation." *Plixer Int'l, Inc. v. Scrutinizer GmbH*, 905 F.3d 1, 5, 8 (1st Cir. 2018) (finding 4(k)(2) jurisdiction over website that sold cloud-based software services to over 150 U.S. customers for revenue of just under $200,000); *Kurbanov*, 963 F.3d 344 at 353 (finding jurisdiction over websites with 10% of all traffic from the United States). The Elahmad Website earns revenue from nearly 4,000 times more United States-based users than the website at issue in *Plixer* and generates comparable yearly revenues; the Elahmad Website has approximately three times more traffic from the United States than the websites at issue in *Kurbanov*.

The targeted advertising of the Elahmad Website "relates to" this case in satisfaction of the

second part of the minimum contacts test. *Ford*, 141 S. Ct. at 1029. "Relates to" does not require

"proof of causation" but only some "connection" between the contact and the suit. *Id*. at 1026. The

banner advertisements were served to users on the same viewing page at the same time the

Protected Channels were streamed. (Ferguson Decl. ¶ 5, Ex. 6.) The advertisements are also central

to the commercial viability of Defendant's free website. Defendant's targeted advertisements are

"close enough" to DISH's claims "to support specific jurisdiction." *Ford*, 141 S. Ct. at 1032.

### iv. Defendant Knew the Elahmad Website was Transmitting in the United States and Chose not to Geoblock it.

The Elahmad Website has a DMCA page stating, "It is our policy to respond to clear

notices of alleged copyright infringement. This page outlines the information required to submit

these notices." (Ferguson Decl. ¶ 6, Ex. 8; FAC ¶ 15.) In publishing a DMCA policy and

attempting to take advantage of the DMCA safe harbor under United States law, Defendant

purposefully availed himself of the protections of the laws of this jurisdiction. Defendant "[s]hould

reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*,

444 U.S. 286, 297 (1980); *see Kurbanov*, 963 F.3d at 344 (finding jurisdiction where defendant

registered a DMCA agent with the U.S. Copyright Office ("U.S.C.O.")).[2]

DISH's counsel sent Defendant 62 copyright infringement notices identifying violations

under United States law based on streaming into the United States; the notices demanded that he

cease providing access to the Protected Channels in the United States. (FAC ¶ 22; Ferguson Decl.

¶ 7; Dkt. 22-6, Ex. 5.) Despite having a DMCA policy, Defendant failed to do what the law

requires: make content on his service inaccessible on notification of infringement from copyright

holders. *See* 17 U.S.C. § 512(c) & (d) (conditioning service provider immunity on compliance

---

[2] Although Defendant did not register an agent with the U.S.C.O., he did have a DMCA page and policy so the availment to the law of the United States analysis is analogous.

with notice and takedown provisions). Defendant neither disabled the Protected Channels on his website nor made the Elahmad Website inaccessible in the United States. (Dkt. 22-5 ¶ 11; Dkt. 22-6, Ex. 5.) Defendant made the deliberate choice to continue to target viewers in the United States. *See Plixer*, 905 F.3d at 8-9 (finding jurisdiction over website that failed to limit access to United States users); *Lang Van, Inc. v. VNG Corp.*, 40 F. 4th 1034 (9th Cir. 2022) (same).

### v.  Exercising Jurisdiction Over Defendant is Reasonable.

Courts also look at the "reasonableness" of haling a foreign defendant into court outside their state of residence. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985). The burden is on the defendant to show that jurisdiction would be unreasonable. *Id.* By defaulting and refusing to participate, Defendant failed to meet his burden to show that jurisdiction would be unreasonable. Nevertheless, it is reasonable for the Court to exercise jurisdiction over defendant because (1) the interest of the forum – the United States – in furthering fundamental social policies supports jurisdiction and (2) DISH has an interest in the efficient resolution of its claims in this Court. *See Luv N' care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 473 (5th Cir. 2006) (reasonableness factors).

The United States has a substantial interest in discouraging Defendant's copyright infringement. United States copyright law generally requires authorization to transmit another's copyrighted content. This system encourages production of new, innovative works; promotes the establishment of a free market to exchange rights; and creates a mechanism to prevent the unauthorized use of intellectual property. *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 428-34 (1984) (discussing public policies furthered by United States copyright law).

DISH has an interest in the efficient resolution of its claims in this Court. DISH is a United States company with its rights limited to the distribution and public performance of the content in the United States, DISH sued under the United States Copyright Act for violations of its United States-based rights that took place in the United States, and DISH has an interest in protecting

itself in United States federal court from Defendant who has availed himself of the resources and benefits of serving the United States market. To force DISH to attempt to litigate its claims abroad would not be efficient or guarantee that a proper alternative forum for relief would be available. Indeed, because DISH's rights are limited to the United States, all the infringement took place in the United States, the harm occurred in the United States, and DISH's rights are protected under United States law, it is unreasonable to assume that any other forum would hear DISH's claims.

### C.  Default Judgment on Count I, Contributory Copyright Infringement.

A claim for contributory copyright infringement has two essential elements: "(1) ownership of the copyrighted material" and (2) that Defendant "with knowledge of the infringing activity, induces, causes or materially contributes to infringing conduct of another." *Alcatel USA, Inc. v. DGI Technologies, Inc.*, 166 F.3d 772, 790 (5th Cir. 1999); *see also Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1169 (9th Cir. 2007) ("[O]ne infringes contributorily by intentionally inducing or encouraging direct infringement.").

### 1.  DISH Owns Valid Copyrights.

DISH is the fourth largest pay-television provider in the United States, delivering copyrighted programming to millions of subscribers nationwide. (FAC ¶ 9.) DISH is one of the largest providers of international television channels in the United States. (*Id.*) DISH contracts for and licenses rights for the Arabic channels it distributes from channel owners and their agents including Al Jazeera Media Network; International Media Distribution (Luxembourg) S.A.R.L.; MBC FZ LLC; and World Span Media Consulting, Inc. (collectively, the "Networks). (*Id.* ¶ 10.)

Networks provide the Protected Channels that include Al Arabiya; Al Hayah 1 (a/k/a Al Hayat 1); Al Jazeera Arabic News; CBC; CBC Drama; Future TV; LBC; LBCI (a/k/a LDC); MBC1; MBC3 (a/k/a MBC Kids); MBC Drama; MBC Masr; Melody Aflam; Melody Drama;

Melody Classic; and Rotana America. (*Id.* ¶ 11.) Many works that aired on the Protected Channels and for which DISH holds exclusive distribution and public performance rights are registered with the U.S.C.O. (*Id.* ¶ 12; Dkt. 11-1, Ex. 1; Dkt. 22-5 ¶¶ 16-17; Dkt. 22-6, Exs. 10-11.) DISH also holds exclusive distribution and public performance rights for a vast number of unregistered copyrighted works that aired on the Protected Channels. (FAC ¶ 12; Dkt. 11-1, Ex. 2.)

DISH holds the exclusive right to distribute and publicly perform in the United States the works that air on the Protected Channels under written licensing agreements with Networks. (FAC ¶ 12.) These agreements transferred the specified exclusive rights to DISH. *See* 17 U.S.C. §§ 201(d), 204(a) (authorizing transfer of rights protected under the Copyright Act by signed, written agreement). As the exclusive licensee of the distribution and public performance rights, DISH may sue for Defendant's infringement of those rights. 17 U.S.C. § 501(b); *Mapp v. UMG Recordings, Inc.*, 208 F. Supp. 3d 776, 791 (M.D. La. 2016) ("Accordingly an exclusive licensee may sue others for infringement…."), *vacated in part on other grounds*, No. 15-602-JWD-RLB, 2017 WL 3675419 (M.D. La. May 3, 2017); *Davis v. Blige*, 505 F.3d 90, 100 n.10 (2d Cir. 2007) ("Under current copyright law, exclusive licenses are recognized as a type of an ownership interest …. Exclusive licensees may sue without joining the copyright owners.").

These well-pleaded allegations from DISH's FAC, taken as true, satisfy the requirement of copyright ownership. (*See* FAC ¶¶ 10-12; Dkt. 22-5 ¶¶ 16-17; Dkt. 22-6, Exs. 10-11); *see* 17 U.S.C. § 410(c) (stating that a certificate of registration is "prima facie evidence of the validity of the copyright and of the facts stated in the certificate," including ownership); *DISH Network L.L.C. v. Dima Furniture Inc.*, No. TDC-17-3817, 2019 WL 2498224, at *3 (D. Md. June 17, 2019) ("Accepting the allegations in DISH's First Amended Complaint as true, DISH has established that it held the exclusive right to distribute and publicly perform the works on the Protected

Channels….”), *report and recommendation adopted*, 2019 WL 5588901 (D. Md. July 12, 2019); *DISH Network L.L.C. v. Shava IPTV Network LLC*, No. 1:15-cv-00706 (TSE/IDD), Dkt. 120 at 9 (E.D. Va. Sept. 15, 2016) (plaintiffs presumed to have valid copyrights because copyrights registered with the U.S.C.O.); (Dkt. 22-5 ¶ 19; Dkt. 22-6, Ex. 14).

A published work is protected provided if "(1) on the date of first publication, one or more of the authors … is a national, domiciliary, or sovereign authority of a treaty party … ; or (2) the work is first published … in a foreign nation that, on the date of first publication, is a treaty party." 17 U.S.C. § 104(b).

DISH claims protection for works that aired on the Protected Channels and were authored or first published in the United Arab Emirates, Qatar, Egypt, and Lebanon. (FAC ¶ 26.) These nations are party to a copyright treaty adhered to by the United States, the Berne Convention for the Protection of Literary and Artistic Works, and therefore each is a "treaty party" under section 104(b). 17 U.S.C. § 101; U.S.C.O., Circular 38(a), *available at www.copyright.gov/circs/circ38a.pdf*. The works at issue therefore satisfy the requirements of section 104(b) for protection under the Copyright Act.

DISH's copyrighted works need not be registered with the U.S.C.O. to be protected. Registration is only necessary for a "United States work." 17 U.S.C. § 411(a); *UAB "Planner 5D" v. Facebook, Inc.*, No. 19-cv-03132-WHO, 2019 WL 6219223, at *5 (C.D. Cal. Nov. 21, 2019) ("The registration requirement applies only to "United States work[s].""). A work first published in a treaty party is not a "United States work." *See* 17 U.S.C. § 101 (defining the term as a work first published in the United States, simultaneously in the United Sates and another place, or in a foreign nation not a treaty party). DISH alleges that its copyrighted programs are not United States works because they were authored or first published in the United Arab Emirates, Qatar, Egypt, and

Lebanon which are treaty parties under the Copyright Act. (FAC ¶ 26.) Thus, neither DISH nor Networks are required to register their works. 17 U.S.C. § 411(a).

Thirty of DISH's copyrighted works are registered with the U.S.C.O., which creates a presumption of ownership and validity. *See* 17 U.S.C. § 410(c); *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 141 (5th Cir. 2004) ("A certificate of registration, if timely obtained, is prima facie evidence of both that a copyright is valid and that the registrant owns the copyright."); *Shava*, Dkt. 120 at 9 (applying § 410(c) presumption to registered Hindi language programs); (Dkt. 22-5 ¶¶ 16-17, 19; Dkt. 22-6, Exs. 10-11, 14). "[O]wnership of a valid copyright" is established by default. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). DISH is the exclusive licensee under agreements with Networks, and therefore DISH holds the copyrights in the registered works. (FAC ¶ 12); *see Glovaroma, Inc. v. Maljack Prods., Inc.*, 71 F. Supp. 2d 846, 854 (N.D. Ill. 1999) (plaintiffs/assignee created a rebuttable presumption that a third-party copyright claimant was the owner of the copyright via the registration certificate and the defendant introduced no factual evidence to counter the registration certificate); *Smith v. Casey,* 741 F.3d 1236, 1241 (11th Cir. 2014) (explaining that § 501(b) provides standing to both the legal and beneficial owner of a copyright interest and authorizing one to rely on a copyright registration issued to the other).

### 2. Defendant Knew of the Infringement of DISH's Copyrights and Induced and Materially Contributed to it.

The second element of DISH's claim for contributory copyright infringement requires that Defendant "with knowledge of the infringing activity, induces, causes or materially contributes to infringing conduct of another." *Alcatel USA, Inc.*, 166 F.3d at 790.

DISH's public performance rights are infringed by the transmission of the Protected Channels to Elahmad Website users in the United States. *See Am. Broad. Cos. v. Aereo, Inc.*, 573 U.S. 431, 441-51, 134 S.Ct. 2498, 2506-11 (2014) (holding that provider of centralized equipment

used to stream broadcast programming to its subscribers infringed content owners' right of public performance). Defendant induced and materially contributed to infringement of DISH's exclusive public performance rights by providing Elahmad Website users in the United States with easy access to the Protected Channels and the programs aired on them, despite having the ability to prevent such access. (FAC ¶¶ 14-20, 28.) Defendant selected the channels that were made accessible to Elahmad Website users. (*Id.* ¶¶ 15, 29.) Defendant acquired, uploaded, maintained, and controlled the links on the Elahmad Website that were used to connect users to the Protected Channels. (*Id.* ¶¶ 15-16, 29.) Defendant organized and presented the Protected Channels in a way that Elahmad Website users could easily access them. (*Id.* ¶¶ 16, 30.) Defendant's actions created the audience for the infringement of DISH's exclusive public performance rights in the United States. (*Id.* ¶ 28.) Defendant had knowledge of the infringing activity as shown by his receipt of many notices of infringement demanding that he cease providing access to the Protected Channels. (*Id.* ¶¶ 22-23.)

These well-pleaded allegations in DISH's FAC establish that Defendant is contributorily liable for copyright infringement because he served as the intermediary between third parties who directly infringe DISH's exclusive public performance rights and Elahmad Website users, who become a necessary component of the infringement – the audience. *See Perfect 10,* 508 F.3d at 1172 (holding that provider of an internet search engine could be held contributorily liable for copyright infringement because it "substantially assists websites to distribute their infringing copies to a worldwide market and assists a worldwide audience of users to access infringing materials."); *DISH Network L.L.C. v. Khalid*, No. CV H-19-4563, 2021 WL 765709, at *4 (S.D. Tex. Feb. 23, 2021) (granting default judgment and finding owner of similar websites

contributorily liable for copyright infringement based on these allegations). Default judgment should be granted on Count I for contributory copyright infringement.

### D.    Statutory Damages Should be Awarded for Copyright Infringement.

The Copyright Act allows for recovery of the copyright owner's actual damages plus any profits of the infringer, or statutory damages. *See* 17 U.S.C. § 504(a). DISH elects statutory damages and moves the Court to award damages for 23 of its registered, copyrighted works.

#### 1.    Defendant Engaged in Massive Copyright Infringement.

Defendant infringed DISH's copyrights on a massive scale by providing users in the United States with access to the Protected Channels without authorization on the Elahmad Website. Monitoring by an enforcement expert establishes that Defendant provided access to the Protected Channels since at least April 2014. (Dkt. 22-1 ¶¶ 3, 6-8, 15; Dkt. 22-2, Exs. 1-3.) The number of individual works that aired on the Protected Channels during this period is even more substantial.

Most of the copyrighted works aired on the Protected Channels are unregistered non-United States works, for which DISH's monetary remedy is limited to actual damages and the disgorgement of a defendant's profits. *See* 17 U.S.C. §§ 412, 504. The actual damages that DISH sustained are difficult to quantify for the reasons stated in Part II.E.1 discussing permanent injunctive relief, and Defendant's refusal to participate has prevented DISH from obtaining evidence of his profits. Consequently, the damages request is limited to registered works, which allow for recovery of statutory damages.

DISH owns copyrights in at least 30 works registered with the U.S.C.O. ("Registered Works"). (FAC ¶ 12; Dkt. 11-1, Ex. 1; Dkt. 22-5 ¶¶ 16-17; Dkt. 22-6, Exs. 10-11.) 23 of the works were registered within three months of their first publication. (*See* Dkt. 22-5 ¶ 17; Dkt. 22-6, Ex. 11.) These 23 registrations were timely to award statutory damages. *See* 17 U.S.C. § 412(2) ("[N]o

award of statutory damages . . . shall be made for . . . any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work.").

The Registered Works are individual episodes of television series that aired on the Protected Channels. (FAC ¶ 12; Dkt. 11-1, Ex.1; Dkt. 22-5 ¶¶ 16-17; Dkt. 22-6, Exs. 10-11.) Defendant is deemed to have infringed the copyrights in the Registered Works through his default. *See Nishimatsu*, 515 F.2d at 1206; (FAC ¶ 27). In addition, monitoring by an enforcement expert establishes that Defendant provided access to the Protected Channels on the Elahmad Website for almost eight years, which includes the dates these works first aired. (Dkt. 22-1 ¶¶ 3, 6-8, 15; Dkt. 22-2, Exs. 1-3.) DISH requests statutory damages for 23 of the Registered Works.

### 2.     Statutory Damages at $150,000 Per Registered Work.

Statutory damages up to $150,000 per work may be awarded for willful infringement. 17 U.S.C. § 504(c). Courts may consider the following factors in determining whether to award maximum statutory damages: "the willfulness of the defendant's conduct, the deterrent effect of an award on both the defendant and others, the value of the copyright, whether the defendant has cooperated in providing necessary records to assess the value of the infringing material, and the losses sustained by the plaintiff." *Tapestry, Inc. v. Trendy Tex., LLC*, No. H-16-3150, 2018 WL 1558274, at *1 (S.D. Tex. Jan. 19, 2018). Statutory damages of $150,000 for each of the 23 Registered Works, for a combined total of $3,450,000, are appropriate in this case.

Defendant willfully infringed DISH's copyrights. (FAC ¶¶ 22-23, 31, 33.) An infringement is willful if the defendant "knows his actions constitute an infringement." *Broadcast Music, Inc. v. Xanthas, Inc.*, 855 F.2d 233, 236 (5th Cir. 1998). "Willfulness may be inferred if notice of a valid copyright was given prior to infringement." *Malaco Inc. v. Cooper*, No. 300CV2648P, 2002

WL 1461927, at *4 (N.D. Tex. July 3, 2002) (citing *Chi-Boy Music v. Charlie Club, Inc.*, 930 F.2d 1224, 1227 (7th Cir. 1991)). Defendant had knowledge of his infringement. Between February 2014 and February 2021, Defendant received 62 notices demanding that he cease providing access to the Protected Channels. (FAC ¶ 22; Dkt. 22-5 ¶ 11; Dkt. 22-6, Exs. 5-6.) Another 60 notices were sent to service providers of the Elahmad Website and the streams of the Protected Channels. (FAC ¶ 23; Dkt. 22-5 ¶ 12; Dkt. 22-6, Ex. 7.) Defendant used different service providers or links to provide access to the Protected Channels from different locations when the service providers removed the Protected Channels from the Elahmad Website. (*Id.*) Defendant is still providing access to the Protected Channels. (Dkt. 22-1 ¶¶ 3, 6-8, 15; Dkt. 22-2, Exs. 1-3.)

Defendant had knowledge that his conduct constituted contributory copyright infringement, and when summoned to account for his actions, failed to answer and defaulted. Defendant is therefore a willful copyright infringer subject to maximum statutory damages. *See US Green Bldg. Council, Inc. v. Wardell*, No. 3:14-CV-01541-M-BH, 2016 WL 3752964, at *5 (N.D. Tex. June 17, 2016) (applying statutory damages factors under the Copyright Act and concluding that "[b]ecause Defendant's conduct was willful and he admitted that he acted knowingly and intentionally by virtue of his default, an award of statutory damages against Defendant in the maximum amount is warranted"), *report and recommendation adopted*, No. 3:14-cv-01541-M-BH, Dkt. 60 (July 11, 2016); *Superior Form Builders Inc. v. Dan Chase Taxidermy Supply Co.*, 74 F.3d 488, 496 (4th Cir. 1996) (upholding award of maximum statutory damages).

Additional factors such as "the defendant's profits[,]" "a plaintiff's lost revenues[,]" "the potential for discouraging a defendant from engaging in similar behavior going forward[,]" and "whether a defendant has cooperated in providing records from which to assess the value of the infringing material" also support an award of statutory damages of up to $150,000 per work. *US*

*Green Bldg.*, 2016 WL 3752964, at *5.

Defendant profited from the Elahmad Website. The Elahmad Website provided users with access to the Protected Channels 24/7, and did so since at least February 2014. (Dkt. 22-1 ¶¶ 6-8, 15; Dkt. 22-2, Exs. 1-3.) Defendant monetized the Elahmad Website through advertising on the Elahmad Website. (FAC ¶ 20; Dkt. 22-1 ¶ 11.) Defendant likely would not have continued offering the Protected Channels on the Elahmad Website if it were not highly profitable. Considering Defendant did not pay licensing fees for the Protected Channels, it may be inferred that the Elahmad Website generated substantial profits. The Elahmad Website received about 2.17 million visits per month. (FAC ¶ 7.) The estimated worth of the Elahmad Website is about $1.8 million dollars based on its estimated advertising revenue and traffic resulting from Defendant's extensive copyright infringement, including the Protected Channels, since at least February 2014. (FAC ¶ 21.) The exact amount of profits that Defendant received and number of persons using the Elahmad Website is unavailable because Defendant chose to default rather than defend, thereby frustrating attempts at obtain discovery from him.

Defendant's infringement caused DISH to suffer lost subscription revenues, lost market share, and price erosion, which are inherently difficult to calculate. *See* Part II.E.1. It would cost a consumer about $60 per month to subscribe to DISH and receive all the Protected Channels that are licensed and available on DISH's satellite service. (Dkt. 22-3 ¶ 7; Dkt. 22-4, Ex. 1.) During the most recent four years of Defendant's infringement, DISH has lost many thousands of satellite service subscribers to its Arabic programming package, at least in part to Defendant providing access to the Protected Channels on the Elahmad Website. (Dkt. 22-3 ¶ 8; Dkt. 22-4, Ex. 2.) The Elahmad Website received about 595,448 visits per month from persons in the United States. (FAC ¶ 7 (2.17M visits multiplied by 27.44% U.S. traffic).) Each user of the Elahmad Website and each

view of the Protected Channels potentially deprived DISH of substantial revenues. The unauthorized transmission of the Registered Works to Elahmad Website users contributed to DISH's loss because the Registered Works aired on the Protected Channels. (FAC ¶¶ 12, 27; Dkt. 11-1, Ex. 1; Dkt. 22-5 ¶¶ 16-17; Dkt. 22-6, Exs. 10-11.) DISH's large loss of subscribers during the most recent four-year period of Defendant's infringement, the monthly subscription cost to receive all the Protected Channels from DISH, and the thousands of United States users of the Elahmad Website support a maximum statutory damage award of $3,450,000.[3]

Defendant should not be rewarded for his failure to defend this case, which is precluding DISH from calculating actual damages and profits. *See US Green Bldg.*, 2016 WL 3752964, at *5; *see also Teri Woods Publ'g, L.L.C. v. Williams*, No. 12-4854, 2013 WL 6179182, at *4 (E.D. Pa. Nov. 25, 2013) (awarding maximum statutory damages against copyright infringers, without "evidence of Defendants' profits, Defendants' costs avoided or Plaintiffs' lost profits," where defendants failed to answer complaint); *Hydentra HLP Int. Ltd. v. Porn69.org*, No. CV-00451-PHX-DGC, 2016 WL 3213208, at *2 (D. Ariz. June 10, 2016) (awarding maximum statutory damages of $150,000 per work for 84 works for a total of $12,600,000 where defendant posted plaintiff's copyrighted videos on the internet and then failed to answer complaint).

Defendant's clear willfulness and the strong need for deterrence, as shown by ongoing infringement in the face of many notices of infringement and intent to operate his business to steal others' intellectual property, justifies an award of $150,000 per work. *See Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*, 259 F.3d 1186, 1195 (9th Cir. 2001) (statutory damages of $31.68 million were not excessive in case of willful copyright infringement,

---

[3] Maximum statutory damages are supported with only 1,198 United States users of the Elahmad Website during the most recent four years of Defendant's infringement. (48 months multiplied by $60 per month multiplied by 1,198 users of the Elahmad Website equals $3,450,240.)

21

as shown by the defendant continuing to broadcast programming after the case was filed); *China Cent. Television v. Create New Tech. (HK) Ltd.*, No. 15-01869 MMM, Dkt. 158 at 33-34, 44 (C.D. Cal. Dec. 7, 2015) (statutory damages of $30 million for copyright infringement); *Shava*, Dkts. 120 at 12, 124 (awarding $150,000 for each of 171 registered works totaling $25,650,000); *Khalid*, 2021 WL 765709, at *7 (awarding $150,000 for each of 112 registered works totaling $16,800,000); *DISH Network L.L.C. v. Easybox IPTV*, No. 4:19-cv-2994, Dkt. 28 at 2 (S.D. Tex. Feb. 5, 2020) (awarding $150,000 for each of 66 registered works totaling $9,900,000); (Dkt. 22-5 ¶¶ 18-19, 23; Dkt. 22-6, Exs. 12, 14-15, 21). DISH should be awarded statutory damages of $3,450,000, which is $150,000 for each of the 23 Registered Works.

### E.      DISH Should be Awarded Permanent Injunctive Relief.

The Copyright Act authorizes the Court to "grant . . . final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). A permanent injunction is appropriate when the plaintiff shows: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Each requirement for a permanent injunction is satisfied here.

### 1.      DISH's Irreparable Harm and Money Damages are Inadequate.

Reputational injury and lost profits, which are difficult to calculate, each constitute irreparable harm. *See Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1056 (5th Cir. 1997) (finding irreparable harm based on potential damage to reputation); *Fl. Businessmen v. City of Hollywood*, 648 F.2d 956, 958 n.2 (5th Cir. 1981) ("A substantial loss of business may amount to irreparable

injury if the amount of lost profits is difficult or impossible to calculate.").

DISH contracted with Networks granting DISH the exclusive right to transmit the Protected Channels to subscribers in the United States. (FAC ¶ 12; Dkt. 22-3 ¶ 3.) DISH offers the Protected Channels to its subscribers for a fee. (FAC ¶ 9; Dkt. 22-3 ¶ 7.) DISH loses revenues and market share when users receive the Protected Channels through Defendant's unauthorized Elahmad Website, which is provided to users for free, compared to purchasing the channels from DISH. (FAC ¶¶ 20, 34; Dkt. 22-3 ¶¶ 6-8, 10.) Quantifying DISH's lost revenues is impractical as the number of customers that would have selected or otherwise stayed with DISH cannot be easily determined. (Dkt. 22-3 ¶¶ 8, 10.) Defendant's copyright infringement, will lead to accumulating losses that are increasingly difficult to calculate.

DISH is irreparably harmed by subscriber loss and reduction in market share resulting from Defendant's Elahmad Website. *See Khalid*, 2021 WL 765709, at *7 (finding DISH was irreparably harmed by defendant's similar streaming websites); *Dima Furniture*, 2019 WL 249822, at *7 (finding that DISH was irreparably harmed by defendant's infringing streaming service); *Shava*, Dkt. 120 at 13 (finding irreparable harm and monetary damages are inadequate because defendants are liable for copyright infringement and plaintiffs have alleged the difficulty of determining the extent of the harm from the infringements); *China Central*, 2015 WL 3649187, at *13 ("Defendants' conduct has caused irreparable harm because it has materially reduced the number of individuals who subscribe to authorized U.S. platforms for [plaintiffs'] programming, causing lost market share."); *Warner Bros. Entm't, Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003, 1013 (C.D. Cal. 2011) (enjoining unlawful streaming service and finding "the loss of revenue to Plaintiffs and their licensees, which is already significant, will continue to increase, and constitutes irreparable injury"); (Dkt. 22-5 ¶ 19; Dkt. 22-6, Ex. 14).

Second, the unauthorized transmission of the Protected Channels to users of the Elahmad Website irreparably harms DISH by damaging its business reputation and goodwill. The channel streams available on Defendant's Elahmad Website are not subject to DISH's quality assurance and security protocols and are plagued by interruption or downtime and poor picture quality, which harms DISH in the eyes of consumers that mistakenly believe the Protected Channels on the Elahmad Website originate from or are approved by DISH or Networks, or incorrectly assume this is the same level of quality received from a legitimate service such as DISH. (Dkt. 22-3 ¶¶ 11-12); *see Khalid*, 2021 WL 765709, at *7 (finding similar streaming websites irreparably harm DISH by damaging its business reputation and goodwill); *China Central*, 2015 WL 3649187, at *13 ("[D]efendant's infringing conduct has caused irreparable harm because it impairs plaintiffs' brand, reputation, and goodwill by associating their programming with poor quality transmissions and viewing experiences on [defendants'] device."); *WTV Sys., Inc.*, 824 F. Supp. 2d at 1012-14 (finding irreparable harm for reasons that include sub-optimal viewing experience and risk of customer confusion associated with defendant's unauthorized video streaming service).

Finally, Defendant may not be financially able to compensate DISH for the damages caused to date or losses incurred in the future, and therefore Defendant's infringement causes irreparable harm to DISH for which monetary damages alone are not an adequate remedy. *See Khalid*, 2021 WL 765709, at *7 ("DISH is unlikely to actually collect any monetary award granted here, and that fact further supports a grant of a permanent injunction."); *Aspen Tech., Inc. v. M3 Tech, Inc.*, 569 Fed. App'x 259, 273 n.56 (5th Cir. 2014) (upholding injunction and concluding irreparable harm is established where plaintiff will likely be unable to collect any judgment against defendant); *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1217 (C.D. Cal. 2007) (finding irreparable harm under similar circumstances).

### 2.     The Balance of Equities and Public Interest Favor an Injunction.

DISH will be irreparably harmed without an injunction. An injunction would only require that Defendant forego illegal conduct, which deserves no weight in an equitable balancing of factors. *Lakedreams v. Taylor*, 932 F.2d 1103, 1110 n.12 (5th Cir. 1991) ("Where the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense merits little equitable consideration."); *Apple Computer, Inc. v. Franklin Comput. Corp.*, 714 F.2d 1240, 1255 (3d Cir. 1983) (holding injunction may issue despite potentially "devastating effect" on defendant's business because an infringer is not "permitted to construct its business around its infringement").

Permanently enjoining Defendant will advance the public interest by protecting the copyrighted works airing on the Protected Channels, maintaining the incentive for Networks to produce these works and for DISH to license them. *See Khalid*, 2021 WL 765709, at *8 ("It is in the public's interest that the law designed to protect and reward innovation and creativity be enforced."); *China Central*, 2015 WL 3649187, at *14 (Any "interest the public may have 'in receiving copyrighted content for free is outweighed by the need to incentivize the creation of original works'.") (quoting *Grokster*, 518 F. Supp. 2d at 1222).

### 3.     The Court Should Order Third Party Service Providers to Cease Providing Services Supporting Defendant's infringement.

Defendant operated the Elahmad Website by contracting with payment processer PayPal and domain registrars Namecheap and FastDomain; reverse proxy, pass-through security service, CloudFlare; and file sharing service, GitHub. (Dkt. 22-1 ¶¶ 9-10, 12; Dkt. 22-2, Exs. 4-5; Dkt. 22-5 ¶¶ 4-5, 15;Dkt. 22-6, Exs. 1-2). Defendant uses Facebook, Twitter, Pinterest, and YouTube to promote the Elahmad Websites to users in the United States. (Dkt. 22-1 ¶ 12; Dkt. 22-5 ¶ 15.) Defendant also uses email services provided by Google and Microsoft for communications

concerning the Elahmad Website. (Dkt. 22-1 ¶¶ 13-14; Dkt. 22-5 ¶¶ 4-5, 11; Dkt. 22-6, Exs. 1-2, 5-6.) Ordering third-party service providers to cease providing services supporting Defendant's infringement will help prevent Defendant from providing access to the Protected Channels.

Courts have enjoined third parties who received actual notice of a permanent injunction from providing services in connection with copyright infringement. *See Dima Furniture*, 2019 WL 2498224, at *8 (enjoining nonparty internet service providers because of their "active concert or participation" with defendant's infringing conduct); *China Central*, Dkt. 192 at ¶¶ 16-17 (ordering third-party service providers to cease providing 15 types of services); *Khalid*, 2021 WL 765709, at *8 (ordering third-party service providers to cease providing 13 types of services to infringing websites); *Times Content Limited v. Doe*, No. 4:17-cv-01287, Dkt. 10 at ¶ 2 (S.D. Tex. May 5, 2017) (ordering third-party service providers to suspend all services to infringing websites); *Showtime Networks Inc. v. Doe*, No. 2:15-cv-03147-GW-MRW, Dkt. 20 at ¶ 2 (C.D. Cal. Apr. 30, 2015) (same); *Warner Bros. Entm't, Inc. v. Doe*, No. 14-cv-3492, Dkt. 27 at 6-7 (S.D.N.Y. Oct. 3, 2014) (same); (Dkt. 22-5 ¶¶ 18, 21-22; Dkt. 22-6, Exs. 13, 19-20); *see also Arista Records, LLC v. Tkach*, No. 15-cv-3701(AJN), 122 F. Supp. 3d 32, 36-38 (S.D.N.Y. 2015) (holding non-party service providers must comply with injunction, finding "courts that have addressed comparable technological services have similarly held that they fall within an injunction's reach if those services are knowingly used to facilitate injunction violations") (citing cases).

### 4.    The Court Should Order Registries and Registrars to Disable and Transfer to DISH the Domains Supporting Defendant's Infringement.

Defendant used the Elahmad.com domain name to provide access to the Protected Channels. (FAC ¶¶ 1-2, 4, 14-18; Dkt. 22-1 ¶¶ 3-8; Dkt. 22-2, Exs. 1-3; Dkt. 22-5 ¶¶ 4-5; Dkt. 22-6, Exs. 1-2.) VeriSign, Inc. is the registry for .com domains. (Dkt. 22-5 ¶ 24.) Disabling and transferring the Elahmad.com domain name to DISH would at least temporarily prevent Defendant

from providing access to the Protected Channels.[4] (Dkt. 22-1 ¶ 16.)

Similar orders in copyright and trademark cases instructed registries and registrars to disable and transfer infringing domains to the plaintiffs. *See Dima Furniture*, 2019 WL 2498224, at *8-9; *Khalid*, 2021 WL 765709, at *9; *China Central*, Dkt. 192 at ¶ 18; *Times Content Limited*, Dkt. 10 at ¶ 3; *Warner Bros.,* Dkt. 27 at 7; *Shava*, Dkts. 136 at 6, 138 at 2; (Dkt. 22-5 ¶¶ 18-20, 22; Dkt. 22-6, Exs. 13, 16-18, 20).

A proposed permanent injunction has been filed much like the injunctions entered in analogous cases. *See, e.g.*, *Khalid*, 2021 WL 765709, at *8-9; *China Central*, Dkt. 192; (Dkt. 22-5 ¶ 18; Dkt. 22-6, Ex. 13).

## III.    Conclusion

The Court should grant DISH's motion and hold Defendant liable for damages of $3,450,000 and enter a permanent injunction, including an order for third-party service providers to cease providing services supporting Defendant's infringement and an order for registries and registrars to disable and transfer to DISH the domains supporting Defendant's infringement.

Dated: August 25, 2022                          Respectfully submitted,

                                                HAGAN NOLL & BOYLE LLC
                                                By: /s/ Stephen M. Ferguson
                                                Stephen M. Ferguson (attorney-in-charge)
                                                Texas Bar No. 24035248
                                                Southern District of Texas Bar No. 614706
                                                Two Memorial City Plaza
                                                820 Gessner, Suite 940
                                                Houston, Texas 77024
                                                Telephone: (713) 343-0478
                                                Facsimile: (713) 758-0146
                                                Counsel for Plaintiff DISH Network L.L.C.

---

[4] VeriSign was provided with a copy of DISH's motion for default judgment and proposed injunction and thereby given an opportunity to object. (*See* Dkt. 22-8.)